IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>ROBERT D'ANGELO, )<br>)<br>Defendant. )<br>) | Case No. 07-CR-143-C |

GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by its attorneys, Erik Peterson, United States Attorney for the Western District of Wisconsin, and Daniel J. Graber, Assistant United States Attorney, hereby submits this memorandum to aid the Court in the sentencing of the defendant, which is currently set for April 22, 2008.

A.   GUIDELINES COMPUTATIONS

1.   Paragraph 46 – D'Angelo asserts that the tax count and mail fraud count should group under U.S.S.G. § 3D1.2. According to D'Angelo, the plain language of the guidelines states that offenses under § 2T1.1 and § 2C1.1 are to be grouped. D'Angelo acknowledges that in *United States v. Vucko*, 473 F.3d 773 (7th Cir. 2007), the Seventh Circuit ruled that the tax guidelines and mail fraud guidelines should not group. *Id.* at 779. However, he argues *Vucko* is not controlling because the Seventh Circuit decided the issue under § 3D1.2(c) and (d); whereas D'Angelo's case fits under § 3D1.2(a) and (b). D'Angelo's argument is without merit.

The court's ruling in *Vucko* is much broader than what D'Angelo asserts. Ms. Vucko committed wire fraud and then failed to report the income from that fraud on her tax returns. *Id.* at 780. D'Angelo did the same thing. Ms. Vucko argued to the Seventh Circuit that the two crimes were related because the wire fraud scheme produced the income that she failed to report, which made them "closely related." *Id.* D'Angelo argues the same thing. However, the Seventh Circuit specifically rejected this argument in *Vucko*. *Id.* That's the end of the analysis -- it does not matter whether § 3D1.2(a) and (b) apply or whether § 3D1.2(c) and (d) apply -- the harms are different, as are the victims. The court of appeals made this specific finding in *Vucko*: "These two counts fail that basic test. Vucko committed two different crimes, causing two different harms and harming two different victims." *Id.* at 779.

The same reasoning applies here. D'Angelo committed two different crimes, with two different harms, and two different victims. The mail fraud involved theft of honest services. The city of Madison did not receive honest services from D'Angelo because he breached his ethical duty to the city and misused his public office for private gain. In contrast, the filing of a false tax return is a different crime. The victim is the Internal Revenue Service, not the city of Madison. D'Angelo filed a false document with the IRS stating under the penalty of perjury that his tax return was true and correct when he knew that it materially understated his income. This crime has does not require the government to prove that D'Angelo misused city resources for his own private purposes.

Because the two crimes involve different harms and different victims, they should not group and the Court should reject D'Angelo's argument.

B.   GOVERNMENT'S SENTENCING POSITION

The advisory guidelines computation in the PSR is a level 13 @ I (12-18 months). The government believes a sentence near the high end of the guidelines is warranted in this case. The government recommends this sentence based upon the following factors under Title 18, United States Code, Section 3553(a):

1.   Nature and circumstances of the offense

D'Angelo's conduct in this case is serious enough to warrant a sentence near the high-end of the advisory guidelines range. His conduct involved the following:

a.   Violation of public trust and fiduciary duty to the city of Madison -- D'Angelo was not merely another city of Madison employee. He was a department head and the highest paid city employee (other than the Mayor). Moreover, he had overall responsibility and control over the Madison Civic Center, and later the Overture Center for the Arts, once it was completed. Being in charge of a $200 million dollar performing arts center is no small task.

D'Angelo exercised this responsibility by treating his department like his own personal playground -- he made the rules -- everybody followed his rules -- and nobody questioned Bob. He used city resources as his own to run two private businesses on a daily basis, year-after-year, simply because he could.

If that was not enough, D'Angelo compounded the violation by using his

department employees to work on his private businesses during office hours, including his receptionist, his secretary, and members of the maintenance crew.

But, the offense did not stop there. D'Angelo added to his violative conduct by keeping his supervisors (i.e., three different Mayors) in the dark about his actions. He never gave them notice, nor did he ever ask them permission to run operate two private businesses, much less out of his city office, using city resources and staff. D'Angelo knew that if he had been honest with his supervisors, the scheme would have ended.

D'Angelo topped it all off by misusing his position as the head of the department. As the boss, he could get away with his scheme because there was nobody in the office in a position of power to check him or rein him in. This misuse of power and position is what undermines the public's belief and confidence in good and honest government.

The coercive effect from his type of conduct from someone in such a high position of authority and control is unacceptable, and the public's right to honest services from its employees must be vindicated. A sentence near the high-end of the advisory guidelines range provides that vindication, and acknowledges the serious nature of this offense.

  b. Tax cheat – by misusing city resources for his two private businesses, D'Angelo effectively increased his profit margin because he did not have to pay the added costs of normal overhead expenses like: rent for office space and storage; purchasing office equipment and furniture; hiring office staff; and paying monthly bills

for infrastructure like phones, computers, and Internet access.

But D'Angelo went farther.  Because the IRS received a W-2 on his income from the city and the 201 Foundation, he reported this income on his tax returns.  However, the income from his two businesses was self-employment income.  The IRS would not know about this money unless D'Angelo self-reported.  D'Angelo could have told the IRS the truth about this income; but he chose not to.

In short, D'Angelo double-dipped.  He saved money on overhead by using city infrastructure.  Then he saved on taxes by not even reporting all of his income to the IRS.  A sentence near the high-end of the advisory guidelines addresses this two-part cheating.

    2.    <u>The history and characteristics of the defendant</u>

The analysis under this factor, when coupled with the other Section 3553(a) factors identified in this case, also supports a sentence near the high-end for the following reasons:

    a.    Employment history/Education/Finances --  D'Angelo is not a stupid man.  One does not rise to the level of operating a $200 million dollar performing arts center by mistake.  D'Angelo has a college degree.  He also has an impressive employment history that spans thirty years from 1975 to 2005.  Finally, he has a positive net worth with a value in excess of $2,226,000.

Put simply, this defendant did not need to cheat the city of Madison or the IRS.

5

He had all of the benefits of a good education, good jobs, and a healthy financial situation. This makes his criminal conduct all the more troubling because he knew better; he had the benefits and options that many do not have. Thus, when D'Angelo crossed the criminal line, it was knowing and intentional. It was not a mistake in judgment or a one-time fluke.

       b.     Motive --this was not a crime of greed, or desperation. This was a crime of arrogance. D'Angelo ran the Civic Center and figured he could do whatever he pleased. D'Angelo believed he was above the rules. A sentence at the high-end of the advisory guidelines will serve to acknowledge the point -- nobody is above the rules -- not even the boss.

   3.     <u>Promote respect for the law</u>

This final Section 3553(a) factor supports a sentence near the high-end for these reasons:

       a.     Focus -- D'Angelo's focus in this case was on making money versus following the law. His focus needs to change. A high-end sentence sends a loud and clear message that he needs to change his focus, play by the rules, and follow the law.

       b.     Minimizing his conduct -- at the plea hearing the Court asked D'Angelo to state in his own words what he did. D'Angelo replied by telling the Court that he did some private work from his city office using city equipment. But, he added, that he did most of his private work from his home, and that when he did do it at the office, it was usually at night or on the weekends.

D'Angelo still does not get it.  First, he is simply wrong about the timing and amount of private work he did at the office.  For example, the wire fraud counts show that his private work was being done during the week during normal business hours.  (PSR ¶ 27).  And his business recordkeeping system was found on his work computer.  (PSR ¶ 18).  You can't do your bookkeeping from home when the books are kept on your computer at work.

Second, this trivializing of his conduct illustrates either a blind spot or an unwillingness to acknowledge the scope of what he really did.  In either case, a sentence near the high-end should help clarify his reality.  Following the rules (like the city ethics code and the U.S. tax code) sometimes cuts into profits -- but it's the law.

## CONCLUSION

Based upon the above, the government recommends that Robert D'Angelo receive a sentence near the high-end of the advisory guidelines range.

DATED:     04/17/2008

>Respectfully submitted,
>
>ERIK C. PETERSON
>United States Attorney
>
>By:         /s/
>DANIEL J. GRABER
>Assistant United States Attorney